# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **KEITH SEE,** *individually and on behalf* *of all others similarly situated*, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:16-cv-00105-JVB-SLC** |
| | ) | |
| **CITY OF FORT WAYNE,** *in its official* *capacity*, | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

On March 28, 2016, Plaintiff Keith See, on behalf of himself and all others similarly

situated, filed this declaratory judgment action against the City of Fort Wayne in its official

capacity ("the City"), asking that the Court enjoin the City from seizing and destroying the

property of homeless individuals and "evicting" homeless persons from their encampments

located on public property, a practice which he contends violates the Fourth, Eighth, and

Fourteenth Amendments.[1]  (DE 1; DE 17).

Now before the Court is See's motion for a preliminary injunction under Federal Rule of

Civil Procedure 65, which was filed on May 4, 2016 (DE 5), and supplemented on May 6, 2016

(DE 10).  The motion was referred by District Judge Joseph Van Bokkelen to the undersigned

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1), Federal

Rule of Civil Procedure 72(b), and Local Rule 72-1.[2]  (DE 11).  The motion is fully briefed (DE

---

[1] After filing the instant motion, See amended his complaint to add a First Amendment claim of retaliation
for engagement in protected speech.  (DE 17).

[2] Although See requested a temporary restraining order in his motion, District Judge Joseph Van Bokkelen
observed that See's motion seeking injunctive relief was filed long after the complaint and after the City's counsel
filed an appearance, and as such, it is more properly viewed as a motion for a preliminary injunction.  (DE 11); *see*

22; DE 23; DE 37; DE 40), and a two-day evidentiary hearing was held on the motion on May
25 and 26, 2016 (DE 41; DE 43).

Based on the following facts and principles of law, and after considering the evidence
and argument, I RECOMMEND that See's motion for a preliminary injunction be GRANTED
IN PART and DENIED IN PART.

## I. FINDINGS OF FACT

A.      Keith See

See, the named Plaintiff, has been homeless since January 27, 2016, and was also
homeless for a two-week period in 2015. While he was staying at a homeless encampment on
public property in 2015, the City seized and disposed of See's coat, which had been given to him
by his now-deceased grandfather. The City did not post an advance notice of that cleanup.[3]

In March 2016, before he filed this suit, See learned via text message from Segerson that
the City was cleaning up the homeless encampment located on public property near the Maumee
River ("the Maumee River site") where he had been living for the past two months. The way
See entered the encampment, he did not see the written notices posted by the City 48 hours prior
to the cleanup. See quickly packed his belongings and left the Maumee River site; he did not

---

*Winnig v. Sellen*, 731 F. Supp. 2d 855, 856 (W.D. Wis. 2010) ("The core difference between a temporary restraining
order and a preliminary injunction is that the former may be issued 'before the adverse party can be heard in
opposition.'" (quoting Fed. R. Civ. P. 65(b)(1)(A)).

[3] Similarly, Robert Dunno, a homeless person, testified that in September 2015, the City seized and
immediately disposed of his family Bible, which had his family name on the case and contained old family photos.
No advance notice of the cleanup was posted by the City. Because Dunno had heard a rumor of a possible cleanup,
he placed a note on his property before he left for work that morning, indicating that he would return to retrieve the
property later that day. After learning that his Bible had been seized while he was at work, Dunno contacted Sally
Segerson, a homeless advocate, who went with him to try to retrieve the Bible. Several hours after the cleanup, a
City police officer told Dunno and Segerson that the Bible was "pretty much in a landfill."

lose any personal property in that cleanup.

See then moved to a homeless encampment located on public property under the Wells Street Bridge ("the Wells Street Bridge site") and lived there for two months. There he obtained a mattress and built a platform (the "pallet") on which he placed his mattress and tent. On or about April 29, 2016, the City posted notices at the encampment informing that the site had to be vacated by 8:00 a.m. on May 3, 2016, and that the City would not be responsible for any personal property left behind. (*See, e.g.*, Def.'s Ex. O). See packed his belongings and vacated the site. Before doing so, however, he tried to find someone with a truck to help move his mattress and pallet; he was unsuccessful in doing so within the short time frame. Therefore, See posted a sign on the mattress and pallet that included his name, telephone number, and a statement that the items were personal property and not abandoned; he wanted to come back to reclaim the items when he found someone with a truck.

The City's cleanup of the Wells Street Bridge site ultimately took place on May 5, 2016—two days after the date specified on the posted notice. During the cleanup, See saw cleaning personnel load his mattress and pallet into a truck for immediate disposal.[4]

---

[4] After learning that the City planned to clean up the Wells Street Bridge site and seeing the notices to vacate posted there, Joseph Renner, a homeless advocate, set up his own tent at the encampment to "protest that eviction." Renner posted his name and contact information on the tent, together with a statement that the tent was not abandoned property. (Def.'s Ex. J). On the day of the cleanup, Renner saw City workers deliver two large trash bins and tape a Notice on the lid of each. (Pl's Ex. 3; Def.'s Exs. N, P, Q). The Notice stated that "Identifiable [a]rticles will be removed 24 hours after site clean up" and that the City would not be responsible for personal property left behind. (Pl.'s Ex. 2; Def.'s Exs. P, Q). Renner watched cleaning personnel load and haul away by truckloads various property at the site, including mattresses, pallets, personal effects, and papers. Renner also saw City personnel take down his tent and shove it into one of the two trash bins; he heard his tent poles break in the process.
     Seth Anderson, another homeless advocate, also visited the Wells Street Bridge site prior to the cleanup and saw the notices posted there. He observed that after the notices were posted, some of the homeless persons left the site and moved their property to another encampment. Anderson placed a bag of his own belongings at the encampment labeled with his name and contact information, the date he would pick up the bag, and a statement that the bag contained personal belongings and was not abandoned property. The day after the cleanup, Anderson found his bag in one of the two labeled trash bins, although he had to dig under other people's property to find it.

See then moved to another public property site near the River Greenway between two fences ("the River Greenway site"). After just a few days there, Officer P.J. Smith told him to "grab [his] stuff and leave or it was being thrown away." No written notices were posted in advance. See then took his belongings and left the River Greenway site.

Although See has a criminal history, he has never been cited, arrested, or convicted of any crimes as a result of his homelessness. Last year, See was banned from overnight stays at The Rescue Mission after he was investigated for battery, although he is still allowed to eat meals there. Sharon Gerig, Director of Emergency Services and Community Outreach at The Rescue Mission, testified that The Rescue Mission never turns away men seeking emergency shelter, regardless of criminal history, unless they have been barred from returning "because of something they've done on the property."[5]

B.    Stephen Haffner

Stephen Haffner, Deputy Chief of the Fort Wayne Police Department, testified that he has been involved in the cleaning up of homeless encampments in his capacity as Deputy Chief. He stated that all but one of the cleanups were initiated by citizen complaints, primarily about an abundance of trash and debris. The cleanup of the Wells Street Bridge site was initiated after police were called three times in one week for disturbances among the persons staying at the encampment.

Haffner has visited all of the homeless encampments in the City, stating that he typically observes an abundance of trash, clothing, food containers, tents, fecal matter, toilet tissue,

---

[5] However, Gerig, Seregson, and Stephen Haffner all acknowledged at the hearing that Fort Wayne has a greater number of homeless persons than available shelter beds.

feminine hygiene products, medications, needles, grills, and lawn tools. (*See, e.g.*, Def.'s Exs. A-1 to A-12, I, R, T to Z, AA to CC, EE to WW). The smell of urine is overbearing at most homeless encampments. Haffner explained that it is within the discretion of Rusty York, the City's Public Safety Director, whether to clean up a homeless encampment.[6] Due to the abundance of bodily waste, medical waste, rodents, and other biohazards at the homeless encampments, the City's street department is not properly trained to perform the cleanups; instead, the City contracts with an outside company that has biohazard cleaning experience to perform the work.

The City does not have a written policy addressing the cleaning up of homeless encampments. Haffner testified that it is not the City's practice to cite or arrest individuals in connection with a homeless encampment or a cleanup of a site. Although there are local ordinances prohibiting sleeping in public or being in a park after hours, the City has issued only five citations since January 1, 2011, for such offenses. Haffner stated that typically an officer

---

[6] After visiting the Wells Street Bridge site, Haffner and York decided that due to the extent of debris, the encampment needed to be addressed right away rather than waiting for a citizen complaint. Haffner observed that the extent of the debris at the site had significantly increased since his visit two months earlier, as the debris was now extending from the floor to the ceiling of the bridge and stretching along the riverbank. (*See* Def.'s Exs. A-1 to A-12, I, R, T to Z, AA to CC, EE to WW). The stench of urine and the amount of spoiled food, empty pill bottles, and flies were overwhelming. Somewhere between two to nine homeless persons were residing at the encampment.

The City asked Melinda Waldron of the Fort Wayne Department of Health and Heather Van Wagoner of Risk Management to visit the Wells Street Bridge site. After receiving their reports, the City decided to proceed with the cleanup. Specifically, Waldron noted mattresses; bedding; clothing; personal items; food, both packaged and unpackaged; and an abundance of trash and debris. (Def.'s Exs. A-1 to A-12, JJ to WW). She saw many insects flying around the area, and she testified that open food is an attractant for pests and rodents that carry disease. She observed a great deal of soiled linens and mattresses in which pathogens could remain and be transmitted to persons, rodents, or insects. She noted a pungent odor indicative of urine and fecal matter, and she observed that a nearby area that sloped toward the river appeared as though it was being used as a restroom, causing a risk of water contamination. She supported the City's efforts to clean up the Wells Street Bridge site for purposes of protecting the health of the public and the environment.

When posting the notices at the Wells Street Bridge site, the City received a complaint from a nearby business owner that pallets were being taken from his business and that his recycling dumpster was being filled with debris by persons staying at the site.

just tells a potential violator to move on to another location.

In 2014, City police officers left handwritten notes at a homeless encampment prior to a cleanup, instructing persons to vacate the site and remove their property within 24 hours. In 2015, the City did not issue any written notices at all prior to a cleanup. At some point in 2015, the mayor formed a group of community leaders (the "Homeless Council"), including Segerson, several ministers, a United Way representative, an Outreach Program representative, and Rebecca Karcher from Economic Development, to address what could be done to help the homeless. The Homeless Council asked that the City provide notice to the homeless community 48 hours prior to a cleanup, and the City agreed to do so. Therefore, since January 2016, the City's practice has been to post printed notices at the relevant homeless encampment at least 48 hours prior to a cleanup. (*See, e.g.*, Def.'s Ex. O). The notices state that the site must be vacated by a certain date and time and that the City will not be responsible for any personal property left behind. (Def.'s Ex. O). The back of the notices contain the names and contact information for shelters and other resources for the homeless. (Def.'s Ex. O-1). When posting the notices, the officers also orally notify any homeless individuals who are onsite at the time.

Additionally, when York orders a cleanup, he notifies Ann McAfee of Risk Management, who notifies Karcher in Economic Development, who then calls Segerson, The Rescue Mission, and Park Center, so that they can help notify and provide resources to the homeless.[7] In most cases, these community resources receive notice more than 48 hours prior to a cleanup.

The cleanup of the Wells Street Bridge site on May 5, 2016, was the first time the City

---

[7] For example, The Rescue Mission posts advance notice of the City's cleanups in its dining room so that homeless individuals can see the notices at meal time and then notify others.

did not immediately dispose of personal property—regardless of whether it was identifiable—at the encampment at the time of the cleanup. There, the City placed two large trash bins at the site and taped signs on the lids that stated identifiable property would be removed 24 hours after the cleanup. (Pl.'s Exs. 2, 3; Def.'s Exs. N, P, Q). Haffner explained that on the short notice the City had, it simply borrowed two trash bins from the Parks Department; Haffner commented that the terrain at the Wells Street Bridge site prevented the use of a conventional dumpster, which in any event, would have been open to the rain. During the cleanup, the City workers placed identifiable personal property in the bins, and the bins remained on site for 24 hours after the cleanup. The bins were not maintained in a secure location or supervised. No notice about the City's use of the bins was provided to the homeless other than what was taped to the lid on the day of the cleanup.

Haffner testified that right now the City does not have the means to store identifiable personal property found in conditions such as those under the Wells Street Bridge, expressing concerns about the property's smell and likely contamination with bodily waste and bed bugs. He stated that any public facility storing such items would likely have concerns about cross contaminating others' property or the building itself.

C.    Sally Segerson

Segerson, a homeless advocate known as "Miss Sally" in the homeless community, testified that she has had a street ministry to the homeless population in Fort Wayne since February 2012. Segerson serves meals to the homeless on Monday and Thursday nights and distributes tangible items such as blankets, tents, clothing, and coats; she is a constant figure at the warming centers in the winter. She also works with the homeless population to refer them to

various shelters, including The Rescue Mission, Charis House, Veteran's Administration, and Brightpoint. She participates in the Homeless Council, which meets monthly.

Segerson first approached the City in 2014 and asked that it provide some type of advance notice for the homeless prior to a cleanup of a homeless encampment. Consistent with Haffner's testimony, Segerson testified that at some point in 2014, the City started providing advance notice of a cleanup; however, the notices ceased from November 2014 through December 2015. In January 2016, the City started its current practice of providing notice 48 hours prior to a cleanup by posting printed notices at the site and by informing community resources.

Segerson testified that notice of 72 hours or more before a cleanup would be a better practice because not every homeless person returns to their campsite on a regular basis, particularly in the winter. She also testified that it is even more problematic when the City cleans up several encampments in a short time period, as personal property replaced after the first cleanup may be seized again the next day at another cleanup. Segerson stated that the cleanup of the Wells Street Bridge site was the first time that identifiable personal property was maintained for 24 hours after a cleanup and not immediately disposed of.

## II. CONCLUSIONS OF LAW

### A. *Applicable Legal Standard*

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."[8] *Mazurek*

---

[8] "The standards for issuing temporary restraining orders are identical to the standards for preliminary injunctions." *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001) (citation omitted); *see also Winnig*, 731 F. Supp. 2d at 856; *Tripp v. Scholz*, No. 14-cv-0890-MJR-PMF, 2014 WL 4179840, at *2 (S.D. Ill. Aug. 22, 2014).

*v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and internal quotation marks omitted); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1085-86. The purpose of a preliminary injunction is to maintain the status quo pending the outcome of the litigation. *See Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986).

A party seeking a preliminary injunction must first survive the three requirements of the threshold phase. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. "First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims. Second, that traditional legal remedies would be inadequate. And third, that its claim has some likelihood of succeeding on the merits." *Id.* (citations omitted). If the moving party meets these criteria, then the court proceeds to the balancing phase of the analysis. *Id.*

"In this second phase, the court, in an attempt to minimize the cost of potential error, must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (citations and internal quotation marks omitted). "Specifically, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* To accomplish this, the court employs "a sliding scale approach: [t]he more likely the plaintiff is to win, the less heavily need

the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id*. (citations and internal quotation marks omitted). Where appropriate, the court should also balance the effects of granting or denying the preliminary injunction on nonparties, often referred to as "the public interest." *Id*.

"Taking into account all these considerations, the district court must exercise its discretion to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id*. (citations and internal quotation marks omitted). "In performing this balancing, the court bears in mind that the purpose of a preliminary injunction is to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) (citation and internal quotation marks omitted).

### B. *Analysis*

1.   The Scope of the Requested Relief

As a threshold matter, the City asserts that because the putative class has not yet been certified, the only request for injunctive relief properly before the Court is that of See, the named plaintiff. The Seventh Circuit Court of Appeals' decision in *McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997), is instructive on this issue.

In *McKenzie*, two plaintiffs whose buildings were demolished under the city's "Fast Track" ordinance filed suit seeking an injunction and then sought to broaden the case by serving as representatives of a class of owners of residential, one or two-story buildings in the city. *Id*. at 554. The district court ultimately granted preliminary injunctive relief to the putative class prior to ever ruling on the plaintiffs' request for class certification. *Id*. at 554-55. On appeal, the

Seventh Circuit reversed the preliminary injunction, stating that the two plaintiffs "lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties." *Id*. at 555. The Seventh Circuit explained that because no class had yet been certified, the district court could not consider the interests of third parties, like the putative class members, in deciding whether to issue injunctive relief. *Id*. The Seventh Circuit concluded that because no class had yet been certified, "the only interests at stake [were] those of the named plaintiffs." *Id*. (citing *Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976)). It emphasized that "[a] wrong done to plaintiff in the past does not authorize prospective, class-wide relief unless a class has been certified." *Id*.

The City argues that the import of *McKenzie* is that See cannot obtain class-wide preliminary injunctive relief because no class has yet been certified. *See also Chavez v. Ill. State Police*, 27 F. Supp. 2d 1053, 1081 (N.D. Ill. 1998) ("To the extent that the plaintiffs seek injunctive relief on behalf of the putative class, the absence of an order certifying a class dooms any such request." (citing *McKenzie*, 118 F.3d at 555)). See appears to concede this point in his reply brief, stating: "It is Plaintiff's position that while the injunction is requested on his own behalf, it may, by effect, protect other members of the homeless community in Fort Wayne." (DE 40 at 8); *see, e.g., Wagner v. Duffy*, 700 F. Supp. 935, 947 (N.D. Ill. 1988) (recognizing that while a court cannot grant relief on a class-wide basis prior to certification, there may be a practical effect on a putative class of granting an injunction on behalf of named plaintiffs where the relief afforded to the named plaintiffs is identical to the relief sought by the putative class).

Therefore, for purposes of the instant motion seeking preliminary injunctive relief, the Court clarifies that See is challenging on his own behalf the constitutionality of the City's

practice in cleaning up homeless encampments.[9]  Having framed the scope of the requested

relief, the Court will now apply the above-stated legal standard for preliminary injunctive relief

to See's claims for denial of equal protection of the law (Fourteenth Amendment), cruel and

unusual punishment (Eighth Amendment), and the seizure and destruction of property without

due process (Fourth and Fourteenth Amendments), discussing each in turn.[10]  Ultimately, only

See's claim under the Fourth and Fourteenth Amendments concerning the seizure and

destruction of property has some likelihood of success on the merits.

       2.    <u>See's Claim for Denial of Equal Protection</u>

See argues that the City has a practice of discriminating against homeless persons, and as

such, has violated his right to equal protection under the laws as guaranteed by the Fourteenth

Amendment.[11]

"The Equal Protection Clause directs that all persons similarly circumstanced shall be

---

[9] In his reply brief, See asks that the Court certify the class, if certification is necessary to grant him the requested preliminary injunctive relief.  (DE 40 at 9).  But See has not filed a separate motion requesting this relief as required by Local Rule 7-1(a), and thus, the issue is not properly before the Court.  N.D. Ind. L.R. 7-1(a).  Nor has the issue been briefed by the parties or referred to the undersigned Magistrate Judge.

[10] As stated above, See moves for preliminary injunctive relief based on his claims under the Fourth, Eighth, and Fourteenth Amendments.  (*See* DE 5; DE 6; DE 10; DE 40 at 3).  Only at the close of his reply brief does See mention his First Amendment claim, asserting in a single paragraph that affording him preliminary injunctive relief will also address his First Amendment retaliation claim.  (DE 40 at 21-22).  The Seventh Circuit "has long warned that perfunctory and undeveloped arguments are deemed waived." *United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) (citation and internal quotation marks omitted).  "The parties—not the courts—must research and construct available legal arguments." *Id.* (citation omitted).  Based on See's briefing of the issues, the Court does not find it necessary to further address See's First Amendment claim with respect to the instant motion.

[11] "Unconstitutional policies or customs can take three forms:

(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority."

*Palmer v. Marion Cty.*, 327 F.3d 588, 594-95 (7th Cir. 2003) (quoting *Garrison v. Burke*, 165 F.3d 565, 571-72 (7th Cir. 1999)).

treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation and internal quotation marks omitted). "Often an equal protection violation occurs when [the government] draws distinctions among people based on a person's membership in a 'suspect' class. Suspect classes include race, alienage, and national origin." *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009) (citations omitted). "Another typical equal protection challenge is based on denial of a fundamental right. Fundamental rights include freedom of speech and religion." *Id.* (citations omitted). "With both suspect classes and denials of fundamental rights, the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause." *Id.* (citation omitted).

"Homeless persons are not a suspect class, nor is sleeping out-of-doors a fundamental right." *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) (collecting cases); *see also Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1108-09 (E.D. Cal. Dec. 26, 2012). "In the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of review is rational basis." *Srail*, 588 F.3d at 943; *see, e.g.*, *Saiger v. City of Chi.*, 37 F. Supp. 3d 979, 982 (N.D. Ill. 2014) (applying the rational basis test to plaintiff's claim that the city violated his right to equal protection by distinguishing between homeless and non-homeless sex offenders). This requires the plaintiff to show that: "(1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest." *Smith v. City of Chi.*, 457 F.3d 643, 650-51 (7th Cir. 2006) (citations omitted). In an equal protection claim based on a "class of one," a plaintiff need not demonstrate the second element of an equal protection

challenge. *Srail*, 588 F.3d at 943.

Here, See has not produced any evidence of similarly situated, non-homeless individuals who were intentionally treated differently. Rather, the evidence reveals that two homeless advocates (Renner and Anderson) who placed a tent and a bag at the Wells Street bridge encampment had their property treated in the same manner as the property of the homeless individuals. Nor does See show that the City's actions in cleaning up the homeless encampments were motivated by a discriminatory rationale. *See, e.g.*, *Joel*, 232 F.3d at 1359 (denying plaintiff's equal protection claim where plaintiff failed to show that the challenged ordinance, which had a disproportionate impact on the homeless, had a discriminatory purpose); *Joyce v. City & Cty. of San Francisco*, 846 F. Supp. 843, 858-60 (N.D. Cal. 1994) (concluding that plaintiffs did not demonstrate a likelihood of success on the merits of their equal protection claim where they had not proven that the city's program to address citizen complaints about a broad range of offenses occurring on the streets and in the parks was implemented with the aim of discriminating against the homeless).

Quite to the contrary, the City produced credible evidence that its cleanups of the homeless encampments were motivated by a legitimate state interest: (1) citizen complaints about an abundance of trash and debris; (2) unsanitary conditions posing health risks to both the homeless individuals at the site and the public at large; and (3) unsanitary conditions posing risks of contamination to the environment, including the water supply. Consequently, "the cleanups can be justified for numerous reasons, including aesthetics, sanitation, public health and safety." *Sanchez*, 914 F. Supp. 2d at 113-14 ("The unwritten policy allegedly implemented by the City was simply to clean up the [homeless] encampments."); *see Davison v. City of Tucson*, 924 F.

Supp. 989, 993 (D. Ariz. 1996) ("Given the City's concerns about crime, sanitation, aesthetics, and homeless individuals' use of fire, the Court would be hard-pressed to decide that the Defendants' actions [in vacating a homeless encampment] could not withstand this relatively relaxed constitutional scrutiny.").

Therefore, on the record presented, See has not carried his burden at the threshold phase of the preliminary injunctive relief analysis to show that his equal protection claim has some likelihood of success on the merits.

        3.      See's Claim of Cruel and Unusual Punishment

See also asserts that the City has violated the Eighth Amendment's prohibition on cruel and unusual punishment by criminalizing the act of homelessness.

"The primary purpose of (the Cruel and Unusual Punishments Clause) has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes . . . ." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977) (alteration in original) (citation omitted). In that vein, the Seventh Circuit has articulated that "the Eighth Amendment applies only to convicted persons . . . ." *Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010); *see also Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012); *Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir. 2005).

See, however, has never been cited, arrested, or convicted of any crimes as a result of his homelessness. This is fatal to his Eighth Amendment claim. *See, e.g.*, *Johnson v. City of Dallas*, 61 F.3d 442, 444-45 (5th Cir. 1995) (finding that plaintiffs lacked standing to raise an Eighth Amendment challenge to an ordinance prohibiting sleeping in public where plaintiffs had not been convicted of violating the ordinance); *Wilson v. Neil*, No. 1:13CV745, 2013 WL 5675361,

at *2-3 (S.D. Ohio Oct. 17, 2013) (finding that plaintiffs could not demonstrate a likelihood of success on the merits of their Eighth Amendment claim where they failed to show that they were arrested for sleeping on public property or likely to be arrested for doing so); *Veterans for Peace Greater Seattle, Chapter 92 v. City of Seattle*, No. C09-1032 RSM, 2009 WL 2243796, at *6 (W.D. Wash. July 24, 2009) (concluding that the Eighth Amendment did not apply where plaintiffs were notified that they were potentially in violation of criminal trespass, but no individual had been arrested under the trespass statute or had begun the process of prosecution).

In that same vein, the testimony and evidence at the hearing reflected that it is not the City's practice to arrest homeless persons during a cleanup of an encampment.[12] Rather, Haffner testified that the Fort Wayne Police Department has issued just five citations since January 1, 2011, for being in a park after hours or sleeping in public. He explained that officers typically just tell the potential violator to move along. Therefore, on this record, See has not carried his burden at the threshold phase of the preliminary injunctive relief analysis to show that his Eighth Amendment claim of cruel and unusual punishment has some likelihood of success on the merits.

4.      See's Claim of Unlawful Seizure of Property and Violation of Due Process

See next asserts that the City's practice of seizing and disposing of the personal property of homeless persons violates the right to be free from unreasonable seizure and deprivation of due process under the Fourth and Fourteenth Amendments.[13] This claim has more traction than

---

[12] Although See cites various local ordinances in his briefs, he does not directly attack the constitutionality of these ordinances and instead challenges the City's practice of cleaning up homeless encampments. (*See, e.g.*, DE 40 at 20).

[13] See does not raise a Fifth Amendment claim that his property was taken for public use without just compensation.

See's other claims.

Under the Fourth Amendment's prohibition of unreasonable searches and seizures, a seizure has been found to occur whenever "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992) (citation omitted). A seizure is deemed unreasonable if the government's legitimate interest in the search or seizure does not outweigh the individual's interest in the property seized. *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1058-59 (7th Cir. 2000). "Abandoned property is not subject to Fourth Amendment protection." *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000) (citing *Abel v. United States*, 362 U.S. 217 (1960); *United States v. McDonald*, 100 F.3d 1320, 1327 (7th Cir. 1996)). Fourth Amendment protections do, however, attach to unattended property. *Joyce*, 846 F. Supp. at 863. "The Fourth Amendment protects . . . homeless individuals' retreats, regardless how ramshackle." *Cobine v. City of Eureka*, No. C 16-02239 JSW, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016). "[T]he government may not take property like a thief in the night; rather, it must announce its intentions and give the property owner a chance to argue against the taking." *Lavan v. City of L.A.*, 693 F.3d 1022, 1032 (9th Cir. 2012) (citation omitted).

The personal property of See, a homeless person, is entitled to Fourth Amendment protection. The specific question is whether the City's practice in cleaning up homeless encampments amounts to a violation of that Fourth Amendment protection. In 2015, the time period in which See's coat (and Dunno's Bible) was seized, the City was not posting advance notice of a cleanup and was immediately destroying personal property at the site at the time of the cleanup. Litigants have succeeded in challenging a practice of seizing and destroying

homeless individuals' non-abandoned possessions without any notice or an opportunity to be heard either before or after the seizure of property. *See, e.g.*, *Lavan*, 693 F.3d at 1028 n.6; *Acosta v. City of Salinas*, No. 15-cv-05415 NC, 2016 WL 1446781, at *5 (N.D. Cal. April 13, 2016).

However, "[i]n deciding the likelihood of success on the merits, the Court's inquiry does not end if the movant shows that specific instances of misconduct have occurred in the past." *Love v. City of Chi.*, No. 96 C 0396, 1998 WL 60804, at *9 (N.D. Ill. Feb. 6, 1998). "The movant must further demonstrate 'a reasonable probability that the conduct was part of an official policy and to that end that there is a substantial likelihood that future violations will occur.'" *Id.* (quoting *Daniels v. Southfort*, 6 F.3d 482, 485 (7th Cir. 1993)). "An injunction cannot issue without a showing that plaintiffs face future harm." *Id.* at *11 (citing *Daniels*, 6 F.3d at 485).

Recently, the City has taken steps to improve the way it handles the cleaning up of homeless encampments. Since January 2016, the City has posted notices 48 hours prior to a cleanup and has also notified Segerson, The Rescue Mission, and other community resources so that they could help provide the homeless with notice of the cleanup and of the community resources available to them. The City adopted this practice in response to the Homeless Council's request that the City provide 48-hour advance notice of a cleanup and indicate the specific date and time that the cleanup will commence. For the most part, the evidence and testimony presented at the hearing indicated that this 48-hour notice practice has been effective in reducing the amount of personal property seized in a cleanup.

In that regard, See testified that, in contrast to the 2015 cleanups, he received prior notice

of the cleanups at the Maumee River site and the Wells Street Bridge site through either notices posted at the encampments or through communications by community resources. Both times he was able to pack his belongings and move from the site prior to the cleanup. Only at the Wells Street Bridge site did the City seize any of his personal property—a mattress and a pallet. See was unsuccessful in his efforts to find someone with a truck to transport these two bulky items within the 48 hours; therefore, he labeled the items with his name, telephone number, and a statement that they were not abandoned property, hoping he could reclaim them later. Nevertheless, the City disposed of the items during the cleanup.

As See points out, the City has deviated from its 48-hour notice practice on occasion. In cleaning up the Wells Street Bridge site, the City's notices indicated that the cleanup would commence at 8:00 a.m. on May 3, 2016. But nothing happened on May 3, 2016, leading to some confusion among the homeless population. The cleanup was actually effected two days later on May 5, 2016. The City's failure to effect a cleanup at the specific date and time posted on the notices increases the risk of erroneous or unconstitutional seizure of homeless persons' personal property.

See additionally points to his encounter with an officer at the River Greenway site in May 2016, stating that there he did not receive 48-hour advance notice to vacate. He testified that an officer simply told him to "grab [his] stuff and leave or it was being thrown away." However, on the record presented, See's encounter with the officer at the River Greenway site could have been an isolated incident arising from See's particular choice of location near the River Greenway, rather than pursuant to the City's practice of cleaning up homeless encampments. *See Love*, 1998 WL 60804, at *9 (concluding that the city's partial deviation

from its usual practice in a few isolated instances did not establish that the City had a pervasive plan to violate its own procedures or plaintiffs' constitutional rights). But in any event, the officer's threat that he would throw away See's property has at least some relevance to the issue.

Clearly, however, the City's post-deprivation process has been slower to evolve than its implementation of advance notice. The City's practice up until May 5, 2016, was to immediately dispose of all property at the site at the time of cleanup without providing any opportunity for owners to reclaim the property. As stated earlier, this type of immediate destruction of homeless persons' non-abandoned property has been found to violate the Fourth and Fourteenth Amendments. *See Lavan*, 693 F.3d at 1032-33. The cleanup of the Wells Street Bridge site was the first time that the City retained identifiable personal property for 24 hours after a cleanup, and there the City did so rather haphazardly—by placing the property in two garbage bins, taping signs on their lids, and leaving the bins on site for 24 hours. As such, the Court is unpersuaded that the City has actually implemented a post-deprivation process under which the homeless can reclaim seized property.

"[D]ue process requires law enforcement 'to take reasonable steps to give notice that the property has been taken so the owner can pursue available remedies for its return.'" *Id.* at 1032 (quoting *City of West Covina v. Perkins*, 525 U.S. 234, 240 (1999)). "Within this most basic scope of the due process guarantee is a homeless person's ownership interest in property that she has left unattended but not abandoned." *Carr v. Or. Dep't of Transp.*, No. 3:13-cv-02218-MO, 2014 WL 3741934, at *4 (D. Or. July 29, 2014) (citation omitted); *see, e.g.*, *O'Callaghan v. City of Portland*, No. 3:12-CV-00201-BR, 2013 WL 5819097, at *4 (D. Or. Oct. 29, 2013) (finding that sufficient due process was provided where plaintiff was given notice 24 hours prior to the

removal of his personal property from the public land on which he was illegally camping, the city stored the property for 30 days, and a process existed for plaintiff to reclaim his removed property); *Love*, 1998 WL 60804, at \*9-11 (finding the city's cleaning practice to be constitutional where it incorporated three types of advance notice—one day prior, 12 hours prior, and 20 minutes prior—and a designated "safe area" to which homeless persons could temporarily move their personal property during a cleaning).

This lack of a post-deprivation process where homeless persons have the opportunity to reclaim seized property, when coupled with just a 48-hour advance notice of a cleanup, raises serious due process questions, particularly where there is no designation of a "safe area" to which homeless persons could move their property during a cleanup, *Love*, 1998 WL 60804, at \*11. As such, See has met his burden of demonstrating that he has some likelihood of success with respect to his Fourth and Fourteenth Amendment claims stemming from the seizure and destruction of personal property, as well as the potential for continuing violations.

The loss of personal effects may pose a minor inconvenience for many citizens, but "the loss can be devastating for the homeless." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D. Fla. 1992). As such, courts have recognized that homeless persons, such as See, "have a compelling ownership interest in their personal property, especially given the vulnerability of [] homeless residents[.]" *Acosta*, 2016 WL 1446781, at \*8 (alteration in original) (citation and internal quotation marks omitted); *see also Lavan*, 693 F.3d at 1031-32; *Martin v. City & Cty. of Honolulu*, No. 15-00363 HG-KSC, 2015 WL 5826822, at \*8 (D. Haw. Oct. 1, 2015). The property seized during a cleanup may be all that a homeless individual has, and may include personal papers, social security cards, and medicines, as well as unique and irreplaceable

property, such as the jacket given to See by his grandfather.  *See Kincaid v. City of Fresno*, No. 1:06-cv-1445 OWW SMS, 2006 WL 3542732, at \*33 (E.D. Cal. Dec. 8, 2006).

Additionally, the seizure of shelter, bedding, and clothing makes it more difficult for a homeless person to survive and also affects his ability to obtain and maintain employment, which in turn, is key to his effort to end his condition of homelessness.  *Id.*  Other courts balancing the hardships in similar cases have further observed that the "destruction of the property of the homeless has a devastating effect on the dignity of homeless people, who live a precarious existence and then are knocked down even lower from this destruction."  *Id.*  Consequently, money damages would be inadequate to relieve the harm caused by such violations.  See, as a homeless person, has succeeded in showing that he will suffer irreparable injury and have no adequate remedy at law if preliminary injunctive relief is not granted.

Moving on to the balancing phase, the Court must examine the harm which the injunction might cause the City and weigh it against the injury threatening See.  The City's interest in conducting the cleanups is to reduce the health risks caused by the unsanitary conditions at the encampments, as well as to reduce the risk of contamination to the environment.  The Court acknowledges that these are weighty concerns.  However, the City can keep its public areas clean without the wholesale, immediate destruction of the personal property of homeless people. See's interest, as a homeless person, in maintaining the few necessary personal belongings he might have is significant.  As one district court concluded in a similar case: "The City will still be able to lawfully seize and detain property, as well as remove hazardous debris and other trash; issuance of the injunction would merely prevent it from *unlawfully* seizing and destroying personal property that is not abandoned without providing any meaningful notice and

22

opportunity to be heard." *Lavan v. City of L.A.*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011).

"This not only benefits [See, a homeless person], but the general public as well." *Id.* at 1019-20

(citing *Pottinger*, 810 F. Supp. at 1573).

 As such, I conclude that the issuance of a preliminary injunction would be proper based

on the serious questions raised by See's Fourth and Fourteenth Amendment claim stemming

from an unreasonable seizure of personal property and violation of due process, the balance of

hardships tipping in favor of See, the strong possibility of irreparable injury to See, and the

interests of the public.

 Although Rule 65 states that preliminary injunctive relief may issue "only if the movant

gives security in an amount that the court considers proper to pay costs and damages sustained

by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), here

See is homeless and has no resources. Therefore, the Court does not recommend that See be

required to post a bond at this time. *See, e.g.*, *Cobine*, 2016 WL 1730084, at *8 (declining to

require bond under Rule 65 when affording homeless plaintiffs preliminary injunctive relief).

 Accordingly, I RECOMMEND that See's motion for a preliminary injunction be

GRANTED IN PART and that the City, its agents and employees, be preliminarily ENJOINED

from doing any of the following:

 1. Seizing See's personal property during a cleanup of a homeless encampment

  absent an objectively reasonable belief that such property: (a) is abandoned, after

  the City has notified relevant community resources and posted notices at the

  encampment at least **72 hours** in advance of the cleanup, (b) presents an

  immediate threat to public health or safety; or (c) is evidence of a crime, or is

contraband; and

2.      Absent an immediate threat to public health or safety, destroying any said

personal property that is seized in a cleanup of a homeless encampment without

maintaining it for a period not less than **72 hours** and posting notices advising

where the property is and how See may reclaim it without cost;

and that See's motion for a preliminary injunction be otherwise DENIED.

### III.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge RECOMMENDS that

Plaintiff's motion for a preliminary injunction (DE 5; DE 10) be GRANTED IN PART and

DENIED IN PART in accordance with this Report and Recommendation.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for

the parties.  NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of

this recommended disposition, a party may serve and file specific, written objections to the

proposed findings or recommendations.  Fed. R. Civ. P. 72(b).  FAILURE TO FILE

OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE

DISTRICT COURT'S ORDER.

SO ORDERED.

Entered this 16th day of June 2016.

/s/ Susan Collins_____
Susan Collins,
United States Magistrate Judge